UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 26-mj-53 (MJD/LIB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S |
| v. | ) | CONSOLIDATED RESPONSE |
| | ) | TO DEFENDANT'S PRETRIAL |
| MOHAMED ABDIRIZAK JAMA, | ) | MOTIONS |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Michael Hakes-Rodriguez, Special Assistant United States Attorney, hereby submits its consolidated response to defendant's pretrial motions. The United States opposes the motions and respectfully requests the opportunity to file supplemental briefing, if necessary, based on any reply filed by the defendant or any oral arguments before the Court.

### STATEMENT OF FACTS[1]

On January 20, 2026, at approximately 11:15 a.m., Border Patrol Agents ("BPAs") with U.S. Customs and Border Protection, Strike Team 4 were conducting immigration enforcement operations in Saint Cloud, Minnesota. Strike Team 4 consisted of four uniformed BPAs operating a black Chevrolet

---

[1]    The information below is drawn from the criminal complaint in this matter and previously disclosed law enforcement reports.

Suburban.   The agents were wearing tactical vests with clearly visible law enforcement identifiers.



*Figure 1: BPA No. 1*



*Figure 2: BPA No. 2*



*Figure 3: BPA No. 3*



*Figure 4: BPA No. 4*

2

During the operation, BPAs observed a white van parked at an apartment complex with a driver and a passenger inside. The agents conducted a license plate query which revealed the vehicle was registered to an individual with no legal status in the United States who was also flagged in law enforcement databases as "armed and dangerous."



*Figure 5: CIS return showing legal status expired*



*Figure 6: CIS return showing photograph and "armed & dangerous warning"*

Based on the physical descriptors associated with the registered owner, and the fact that Jama was operating that individual's vehicle, agents believed Jama may be that individual. This belief was based on the similar age range, similar facial hair, similar complexion, and the driver's operation of the

3

registered individual's vehicle. Because the BPAs believed Mr. Jama was armed and dangerous with expired legal status, they decided to further investigate.



*Figure 7: BWC screenshot of Mr. Jama*

The BPAs watched as Jama exited the vehicle and entered the apartment building while the passenger remained inside. Once Jama returned to the driver's seat, the agents approached. As agents approached on foot, they were still wearing clearly visible law enforcement identifiers and verbally identified themselves as Border Patrol. Agents also issued verbal commands for Jama to exit the vehicle.

Instead of complying, Jama yelled at the agents, placed the vehicle in reverse, and fled. The BPAs returned to their vehicle and initiated pursuit. During the pursuit, Jama failed to stop at stops signs and stop lights.

(Government Exhibit 1).[2]   To safely stop the vehicle, BPAs attempted a controlled boxing maneuver using their vehicle.  Rather than stop, Jama accelerated and cut across his lane of travel using his vehicle to ram the BPAs' vehicle.  (Government Exhibit 1).[3]  After striking the agents' vehicle, Jama drove across a median and into oncoming traffic, travelling in the wrong direction on the roadway.  (Government Exhibit 2).[4]

As the pursuit continued, agents again positioned their vehicle in Jama's path to try and stop him.  This time, the agents were able to maneuver their vehicle and successfully force it to a stop.  The agents then exited their vehicle and safely placed Mr. Jama under arrest.

Mr. Jama was thereafter charged by Complaint, and later Misdemeanor Information, with one count of Assault on a Federal Officer in violation of 18 U.S.C. § 111(a)(1).  The charge was based on his flight from agents and his use of a vehicle to striking the agents' vehicle.

---

[2]   The United States will submit Government Exhibit 1, (Axon_BWC_BPA_4_01-20-2026_D01D02298.mp4) footage showing the pursuit, for the Court's review. See timestamp 12:23:12 for footage of Jama making an illegal and dangerous left turn at a red light.

[3]   *Id.* See timestamp 12:23:45 for footage of Jama striking the BPAs vehicle.

[4]   The United States will submit Government Exhibit 2, (Axon_BWC_BPA_2_1-20-2026_D01D05330.mp4) footage showing the pursuit, for the Court's review. See timestamp 12:23:45 for footage of Jama striking the BPAs vehicle and driving on the wrong side of the road.

## I.   Motion to Dismiss for Outrageous Government Conduct (ECF No. 34)

Mr. Jama moves to dismiss the Information, claiming that law enforcement "manufactured an alleged crime to justify their unjustified vehicular pursuit and warrantless arrest[.]"  ECF No. 34.  The United States opposes the motion.

### a.  Legal Standard

Dismissal of a criminal case based on alleged outrageous government conduct is an extraordinary remedy that applies only in the rarest of circumstances.  *See United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (citing *United States v. Russell*, 411 U.S. 423, 432 (1973) and *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003)).  The Eighth Circuit has emphasized that this doctrine is "reserved for conduct that falls within the narrow band of the most intolerable government conduct."  *King*, 351 F.3d at 867.  Dismissal is appropriate only where law enforcement conduct violates "that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause."  *Combs*, 827 F.3d at 794 (citing *Russell*, 411 U.S. at 432).

This is an intentionally demanding standard.  The Eighth Circuit has explained that although the doctrine theoretically exists, the level of misconduct required to justify dismissal is "quite high," and the government's conduct must truly "shock the conscience of the court."  *King*, 351 F.3d at 867;

6

*see also Combs*, 827 F.3d at 795 ("We are aware of only two reported court of appeals decisions—both from the 1970s—that have deemed the government's conduct so outrageous as to violate due process."); *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (noting that dismissal is warranted only when government conduct falls within the "*narrow* band of *the most intolerable* government conduct") (emphasis added).

The outrageous conduct doctrine focuses on the nature of the government's investigative conduct. *United States v. Hunt,* 171 F.3d 1192, 1195 (8th Cir. 1999). The Eight Circuit has rejected attempts to characterize standard investigative techniques as outrageous government conduct, recognizing that aggressive investigative tactics do not become unconstitutional merely because they provide an opportunity to commit a crime. *See Bugh*, 701 F.3d at 894 (finding that use of confidential informants is a permissible law enforcement technique); *Combs*, 827 F.3d at 795 (concluding that infiltration of criminal enterprises and participation in planned criminal activity are recognized investigative methods that generally do not violate due process).

Because dismissal is such a drastic remedy, the defendant bears a heavy burden. *King*, 351 F.3d at 867. The doctrine applies only to the most egregious and intolerable forms of government misconduct, not to routine investigative decisions or tactical judgments made during criminal investigations. As the

7

Eighth Circuit has summarized, the government's conduct must be more than aggressive, persistent, or even questionable, it must be conduct that violates fundamental fairness and shocks the conscience before dismissal is warranted. *Bugh*, 701 F.3d at 894; *King*, 351 F.3d at 867; *Combs*, 827 F.3d at 795.

Courts find government conduct sufficiently outrageous only in rare instances. *Combs*, 827 F.3d at 795. It is not enough for the government to create the conditions necessary for a crime to occur. For the government's role in an offense to shock the conscience, the government must reach a demonstrable level of outrageousness. *Id.* citing *United States v Twigg,* 588 F.2d 373, 380 (3d Cir. 1978). In *Combs,* an ATF agent presented a target of opportunity, hired the crew to commit the robbery and produced a getaway car for use in commission of the robbery. *Combs,* 827 F.3d at 793-795. The court in *Combs* cited *Greene v United States*, saying that government conduct may shock the conscious when it involves "itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet [seeks to] prosecute its collaborators". *Id.* citing *Greene v United States,* 454 F.2d 783, 787 (9th Cir. 1971).

However, the court reasoned that even in this situation where an agent participates in the planning of a crime, and provides resources for the crime, it does not exceed the level of permissible law enforcement tradition. *Combs,* 827 F.3d at 795. Accordingly, the court found that the ATF's operation was not so

8

shocking to the universal sense of justice that they violated the fundamental fairness required by the Due Process Clause. *Id.* at 795, 796.

Furthermore, as seen in *Hunt*, even when the government supplies material support which is essential to the commission of a crime, it may still prosecute the defendant for the commission of that crime. *Hunt,* 171 F.3d 1192 at 1195. There, the government provided 2,088 grams of ephedrine, a chemical necessary for the production of methamphetamine, as a part of an undercover operation to prosecute the defendant for the production of methamphetamine. *Id.* The court reasoned that law enforcement may go "a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process". *Id.* citing *United States v Kummer,* 15 F.3d 1455, 1460 (8th Cir. 1994). Accordingly, the court ruled that the government's conduct was not sufficiently outrageous to shock the conscience. *Id.*

These cases illustrate that government conduct must be truly shocking to violate a defendant's Due Process rights. It is not enough that the government plays a role in the commission of an offense or even creates the conditions necessary to commit it. The court finds that the government manufactures an offense when it engages in direct and continuous involvement in the criminal enterprise, not standard investigative procedures, aggressive, persistent or even questionable behavior.

*b. Argument*

Here, the BPAs' conduct falls far short of the type of extreme, conscience-shocking behavior required to justify dismissal under the outrageous government conduct doctrine. The investigation began with objective law enforcement information that justified further inquiry. Agents were investigating a vehicle associated with an individual identified in law enforcement databases as having expired immigration status and being flagged as armed and dangerous. Agents then observed Jama operating that vehicle and reasonably sought to confirm his identity. The agents' conduct reflects routine and permissible investigative techniques rather than the type of extreme misconduct required to support dismissal.

Importantly, any escalation of events in this case resulted from Jama's own voluntary and dangerous decision to flee, not from any government overreach. Indeed, rather than comply with clearly identified federal officers, Jama fled, committed multiple traffic violations, drove recklessly, rammed an occupied law enforcement vehicle, and continued fleeing despite opportunities to stop. These were independent criminal acts committed by Jama, not conduct created or manufactured by law enforcement. To the contrary, the agents did not "manufacture" any crime here. For example, they did not encourage Jama to flee or to ram his vehicle into theirs simply because they approached him and attempted to stop him. Instead, Jama independently chose to flee and run

10

into the agents' vehicle to avoid contact with law enforcement. That distinction is fatal to any outrageous conduct claim.

In sum, this case did not involve any of the type of "aggressive" law enforcement techniques the Eighth Circuit finds reasonable, like deception or use of informants, but was much more routine. *Combs*, 827 F.3d at 795-96. Instead, the facts here reflect nothing more than a lawful investigation, a reasonable attempt to identify a suspect, as well as Jama's voluntary flight, dangerous resistance, and assaultive conduct. That is the opposite of the type of conscience-shocking misconduct contemplated by the doctrine. Jama's motion should be denied.

Of note, Jama's attempt to paint the facts of this case as "outrageous" is inconsistent with the objective evidence. Contrary to Jama's assertion in his motion, the BPAs were wearing clearly identifiable law enforcement markings on their clothing when they initially approached Jama and they verbalized as much to him as well. Moreover, the BPAs did not "manufacture an alleged crime" to justify their approach of Jama. They were acting under reasonable suspicion that Jama was the registered owner of the vehicle based on objective facts drawn from the registered owner's photo in comparison to Jama's characteristics and given the "armed and dangerous" warning. Jama's assertion that he and the registered owner of the van "looked nothing alike" is not a sufficient basis for dismissal and is more appropriately addressed via

11

Jama's suppression motion at ECF No. 37.  Furthermore, the BPAs did not unlawfully pursue Jama, they gave chase after he failed to stop and drove in a reckless and dangerous manner, including driving into oncoming trafficking to evade police.  Jama's motion fails on its face and should be denied.

Jama's motion is both factually and legally deficient.  Law enforcement conducted a records check of a public facing license plate, learned of potentially illegal conduct by the registered owner, approached to confirm identity, clearly identified themselves, attempted to conduct a lawful stop, and pursued after Jama fled.  These rather routine components of everyday policing are not extraordinary, much less "outrageous."  Jama's motion should be denied.

## II.   Motion to Dismiss for Failure to State an Offense, of Alternatively, for a Bill of Particulars (ECF No. 35)

Mr. Jama moves to dismiss the Information for failure to state an offense, claiming that the charging instrument "does not identify any conduct" that constitutes a crime.  ECF No. 35.  The United States opposes the motion.

### a. Legal Standard

A federal charging instrument, like an Information, "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and include the "provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  The instrument is valid if it "contains all of the essential elements of the offense charged, fairly informs the

12

defendant of the charges against which he must defend, and alleges sufficient information to allow the defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Palmer*, 917 F.3d 1035, 1039 (8th Cir. 2019). Generally, an indictment need only track the statutory language. *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). An indictment is sufficient unless "no reasonable construction can be said to charge the offense." *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995).

The purpose of a bill of particulars is to inform a defendant of the nature of the charges against him and to prevent or minimize the element of surprise at trial. *United States v. Beasley*, 688 F.3d 523, 532 (8th Cir. 2012). A bill of particulars is not intended to provide a defendant with evidentiary detail or discovery regarding the defendant's case. *United States v. Hester*, 917 F.2d 1083, 1084 (8th Cir. 1990); *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011) ("[A] bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial."); *United States v. Hill*, 589 F.2d 1344, 1352 (8th Cir. 1979) ("A bill of particulars is not to be used for discovery purposes."). Rather, it is required only when necessary to inform a defendant of the charges against him with sufficient clarity to enable him to prepare his defense, to minimize the element of surprise at trial, and to protect himself against a second prosecution

13

for an inadequately described offense. *United States v. Wessels*, 12 F.3d 746, 750 (8th Cir. 1993).

Under Fed. R. Crim. P. 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment is "legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." *Wessels*, 12 F.3d at 750 (*citing United States v. Young*, 618 F.2d 1281, 1286 (8th Cir. 1980)). An indictment is sufficient "unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense" with which the defendant is charged. *Sewell*, 513 F.3d at 821.

### b. Argument

The Misdemeanor Information in this case satisfies the requirements of Fed. R. Crim. P. 7 and *Wessels*. It clearly tracks the statutory language by alleging: (1) that on January 20, 2026, Mohamed Jama did forcibly assault, resist, oppose, impede, intimidate, and interfere, (2) with a person designated in 18 U.S.C. § 1114, to wit: a Customs and Border Protection employee and (3) such officer and employee was engaged in and on account of the performance of official duties, all in violation of Title 18, United States Code §111(a)(1). *See* ECF No. 18.

This is more than sufficient. By tracking the requisite statutory language, the Information "fairly informs the defendant[] of the charges against which [he] must defend and alleges sufficient information to allow [him] to plead a conviction or acquittal as a bar to a subsequent prosecution." *Palmer*, 917 F.3dat 1039. Additionally, the Complaint and discovery produced to date contain a plethora of information detailing the conduct that the United States alleges violated the law.

The Complaint, which was filed with the Court and found to support probable cause that Jama violated 18 U.S.C. § 111 contains an attached affidavit which gives a detailed and factual account of the charged conduct. Furthermore, the government disclosures clearly show Jama's dangerous and unjustified flight from agents as well as his use of his van to strike the agent's vehicle from multiple vantage points.[5] Accordingly, the Court should deny Jama's motion to dismiss.

## III.  Motion to Suppress (ECF No. 36)

Mr. Jama moves to suppress his stop and arrest, claiming that police did not have reasonable articulable suspicion to initiate their encounter or attempted stop and did not have probable cause to arrest him. ECF No. 36. The United States opposes the motion.

---

[5] Government Exhibit 1, Government Exhibit 2

15

### a. Legal Standard – Terry Stop

Investigatory stops are considered seizures under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). As such, they "must be supported by either probable cause or reasonable articulable suspicion." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (citing *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)). Reasonable articulable suspicion exists where law enforcement has "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Id.* To initiate a traffic stop, all the police must do is "articulate some minimal, objective justification" for the intrusion. *See United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017). If law enforcement can articulate something more than an "inchoate and unparticularized suspicion or hunch" the standard is satisfied. *See United States v. Daniel*, 887 F.3d 350, 354 (8th Cir. 2018) ("The likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.").

The determination is based on the totality of the circumstances. *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992); *Illinois v. Wardlow*, 528 U.S. 119, 125-126 (2000). "Because the determination as to reasonable suspicion must be based on the totality of the circumstances, courts may not

16

view individual elements of suspicion in isolation [and] in fact, *Terry* precludes this sort of divide-and-conquer analysis." *United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020) (internal quotations omitted).   Importantly, the Supreme Court has "consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct." *Navarette v. California*, 572 U.S 393, 403 (2014) (internal quotations omitted); *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot.").

### b.  *Argument – BPAs Attempted to Initiate a Lawful Stop*

Evaluating the totality of the circumstances shows that BPAs had reasonable articulable suspicion to approach and stop Jama for suspicion of unlawful presence in the United States while possibly "armed and dangerous." All that is needed for the agents to be justified in stopping Jama is little more than an inchoate and unparticularized suspicion or hunch. *Daniel*, 887 F.3d 350, 354.  The fact that Jama was driving a car registered to a person listed as "Armed and Dangerous" with expired immigration documents was more than enough for the agents to form a reasonable suspicion that Jama was violating the law.  The fact that Jama shared numerous physical characteristics with the person identified in the CIS report also establishes a reasonable basis to believe Jama may have been him.  In contrast to an unparticularized suspicion,

17

the agents had specific reasons to believe Jama was a specific person known to be committing a specific violation.

The fact that Jama and Adan do not have identical appearances is not sufficient to make the agents' suspicion unreasonable. The possibility of innocent conduct does not rule out the existence of reasonable suspicion. *California*, 572 U.S 393, 403. Likewise, differences in appearance between an identification photo and the person when viewed in real life do not rule out a reasonable suspicion that the person driving Adan's registered vehicle was Adan. It is common for a person's appearance to differ from their identification photo to a certain degree on any given day.

It is true that the individual driving Adan's registered vehicle that day was in fact Jama, not Adan. However, the fact that the agents were mistaken in their identification does not negate the fact that they relied on objective, specific facts to form a reasonable suspicion. This is much more than an inchoate and unparticularized suspicion or hunch and sufficient to establish reasonable suspicion for a *Terry* Stop.

c. *Legal Standard – Probable Cause to Arrest*

It is well-established that "[a]ny traffic violation, however minor, provides probable cause for a traffic stop." *Hollins*, 685 F.3d at 706 (citing *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008)); *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021) ("[A]ny traffic violation, regardless

18

of its perceived severity, provides an officer with probable cause to stop the driver.") This is true even where a traffic stop is a pretext for other investigation. *See United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008); *United States v. Stachowiak*, 521 F.3d 852, 854 (8th Cir. 2008). Critically, even if an initial traffic stop lacked sufficient grounds, a driver's subsequent flight from the scene can provide independent probable cause to stop the vehicle for the felony offense of fleeing a police officer. *See United States v. Cox*, No. 14-CR-0072 PJS/JSM, 2014 WL 2719645, at *6 (D. Minn. June 16, 2014). Flight from police is an intervening event that can purge any previous illegality and independently establish probable cause for an arrest and search. *Id.*

### d. Argument – BPAs Lawfully Arrested Jama for Fleeing

BPAs had probable cause to stop and arrest Jama for the Minnesota felony offense of fleeing in a motor vehicle.[6] This conduct alone was sufficient to give rise to probable cause to arrest Jama. *See Cox*, Case No. 14-CR-0072 PJS/JSM, 2014 WL 2719645, at *6. Even if this was not sufficient basis for probable cause, Jama continued to commit violations during his flight. In the course of his flight, he failed to properly stop at a stop sign, failed to complete a stop before making a right on red at a traffic light, and made a dangerous left turn from the right lane of a four way intersection while the traffic light

---

[6] Minn. Stat. § 609.487, subd. 3.

was still red.[7]  Any one of these violations are sufficient to give the agents probable cause to stop Jama.

It is not required that the agents developed probable cause based on their initial suspicion, only that they had probable cause Jama had committed any crime. *Payne*, 534 F.3d at 951.  It was only after all of these above referenced violations occurred that agents lawfully attempted to stop Jama's vehicle through a controlled boxing maneuver. After Jama failed to stop and struck the agents vehicle, thereby violating 18 U.S.C. 111 the agents developed an additional independent basis to arrest him.  Because Jama's flight gave rise to probable cause, his arrest was justified and his motion should be denied.

## IV.   Motion for Discovery (ECF No. 37)

The United States has complied, and will continue to comply, with Fed. R. Crim. P. 16(a)(1)(A)-(F).  The United States has provided defense with all discovery in the case to date and understands its continuing obligations to disclose materials consistent with the applicable rules.  The United States is similarly aware of its obligations under *Brady*, *Giglio*, and their progeny. *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  The United States has complied, and will continue to comply, fully with those obligations.  To the extent evidence exists that is both favorable to

---

[7] Government Exhibit 1

the defendant and material to either guilt or punishment, it will be, or already has been, timely disclosed. Any impeachment material or witness statements, however, will be produced in accordance with the Jencks Act. *See* 18 U.S.C. § 3500. Disclosure of impeachment material is timely if it is produced in compliance with the requirements of the Jencks Act. *See, e.g., United States v. Miller*, 698 F.3d 699, 704 (8th Cir. 2012); *United States v. Eisenberg*, 469 F.2d 156, 160 (8th Cir. 1972). The United States objects to Ramsey's motion to the extent that it seeks materials that are not required to be disclosed under *Brady*, *Giglio*, and their progeny.

The United States also understands its obligation under *Giglio* and *Brady* to disclose certain other impeachment evidence, if any, for its witnesses. The United States declines to provide any such material with respect to persons who will not be called as witnesses since such a request is beyond the scope of *Brady*, *Giglio*, and their progeny. *See United States v. Eisenberg*, 469 F.2d 156, 160 (8th Cir. 1972); *Miller*, 698 F.3d at 704 (addressing motion under Fed. R. Crim. P. 16(a)(1)(E)(i)); s*ee also United States v. Presser*, 844 F.2d 1275, 1283-85 (6th Cir. 1988) (discussing government's disclosure obligations under Brady, Giglio, the Jencks Act, and Rule 16).

In *Hickman v. Taylor*, 329 U.S. 495, 510 (1947), the Supreme Court concluded that an attorney's work product is protected from discovery. Information collected or prepared by counsel that contains the

21

mental impressions of the attorney in the preparation for actual or potential litigation cannot be discovered by a party's adversary. *Id.* at 511. The protection of work product applies in the criminal context as well. *United States v. Nobles*, 422 U.S. 225, 238 (1975). A lawyer need not be involved at all for the work product protection to take effect, and the protection for documents and tangible things extends to emails. *United States v Adams,* Case No. 0:17-cr-00064-DWF/KMM, 2018 WL 5311410. (internal citations omitted).

The protection recognized in *Hickman* led to the codification of Federal Rule of Civil Procedure 26(b)(3). This Rule creates two categories of information that are generally beyond the reach of discovery: ordinary work product and opinion work product. For ordinary work product, a party may not obtain discovery of documents and tangible things that are prepared in anticipation for litigation by or for another party or that other party's representative. Fed. R. Civ. P. 26(b)(3)(A). However, the protection for ordinary work product is qualified and disclosure may be required if the documents are otherwise discoverable and the party seeking them shows a substantial need. Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii). Even if a showing of substantial need is made and a court orders disclosure of documents prepared in anticipation of litigation, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other

22

representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Thus opinion work product receives greater, near-absolute protection.

The party asserting the work-product protection as a bar to disclosure bears the burden of proving a factual basis for the applicability of the privilege. *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 925 (8th Cir. 1997) The essential showing is that the attorney was preparing for or anticipating some sort of adversarial proceeding involving his or her client. *Id.* at 924. Attorney discussions between themselves or their client made in preparation for charging or trial, are attorney work product. Likewise, draft affidavits prepared in anticipation of charging this matter, are likewise attorney work product. Both categories of requested disclosure contain conclusion, opinions or legal theories of Assistant U.S. Attorneys. To the extent that Mr. Jama seeks disclosure of attorney work product the Government opposes his motion and it should be denied.

Mr. Jama's motion also seeks disclosure of criminal histories, personnel files, training records, internet search histories, photographs and communications of agents, the Government opposes this to the extent that the request exceeds the scope of its obligations. To the extent that Mr. Jama seeks disclosures related to this incident the Government agrees to satisfy its continuing discovery obligations under Fed. R. Crim. P. 16, *Brady*, *Giglio*, and their progeny.

Dated: March 20, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*s/Michael Hakes-Rodriguez*
BY: Michael Hakes-Rodriguez
Special Assistant U.S. Attorney

24