IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Criminal No: 26-mj-53 (MJD/LIB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

MOHAMED ABDIRIZAK JAMA,

Defendant.

**DEFENDANT'S RESPONSE IN SUPPORT OF UNITED STATES' MOTION TO DISMISS WITH PREJUDICE**

## I.     INTRODUCTION

Defendant Mohamed Jama agrees that this matter should immediately be dismissed with prejudice. But the United States' motion to dismiss "in the interests of justice" fails to disclose why the United States is finally walking away from this unfounded prosecution. The Defendant submits this memorandum to provide the Court with the factual context underlying the government's decision, and to make a public record of the failings that led to this unsupported prosecution. This factual context may enable the Court to assess: (1) whether it should conduct a further inquiry into the government's conduct in this and other similar prosecutions brought in the wake of Operation Metro Surge; and (2) whether it should issue an order memorializing the falsity of testimony and dishonest conduct of certain federal law enforcement officers.

The facts demonstrate that the Defendant – a U.S. citizen of Somali descent – was unlawfully approached, chased, and arrested by Border Patrol agents. Notably, the Defendant was not engaged in any protest – he was merely running an errand with a friend before heading to work. Border Patrol agents concocted a false story that the registered owner of the vehicle the Defendant was driving – the Defendant's employer – was unlawfully in the United States. They did so as a pretext to attempt an illegal stop of the Defendant. Border Patrol agents then engaged in an illegal vehicular pursuit of the Defendant using civilian rental cars without lights or sirens and attempted to run the Defendant's vehicle off the road. Border Patrol agents' reckless and unlawful pursuit of the Defendant led to a vehicle accident, which the U.S. Attorney's office charged as an alleged intentional assault on a federal officer.

The truth was only revealed after this Court issued an order finding that the United States had failed to meet its Rule 16 discovery obligations, and failed to conduct an adequate search for and collection of the requisite discovery from DHS. In compliance with this Court's order, the United States made additional disclosures that demonstrated that agents knew that the registered owner of the Defendant's vehicle *was also a U.S. Citizen of Somali descent* before they began their illegal enforcement operation. Thus, Border Patrol agents *knowingly and unlawfully* attempted to exert their extremely limited immigration enforcement authority

against a U.S. Citizen of Somali descent. The Agents then apparently withheld evidence from the U.S. Attorney's Office that would have demonstrated their dishonesty.

To add insult to injury, DHS agents took previously undisclosed selfie photos posing with the Defendant while he was handcuffed in the back of their rental vehicle and being transported to the Whipple detention facility. They took "trophy" arrest photographs at the direct request of DHS leadership for potential use in a DOJ media campaign focused on the U.S. Attorney Office's Section 111 prosecutions.

The Court and the public have a significant interest in ensuring that the abuses that led to this prosecution are officially rebuked and sanctioned.

## II.   FACTUAL BACKGROUND

On January 23, 2026, based on the affidavit of Special Agent Richard Berger, the United States obtained a felony complaint charging Mr. Jama with one count of allegedly forcibly assaulting federal Border Patrol agents in violation of 18 U.S.C. § 111. (ECF No. 1-1.) SA Berger affidavit stated that it was "based on his personal knowledge, as well as information I have learned from other law enforcement officers and the review of reports…" (*Id.* at ¶ 4.) The affidavit alleged that on January 20, 2026, during the height of Operation Metro Surge, Border Patrol "saw a white van (Target Vehicle) parked in the lot of an apartment complex with a person sitting in the driver's seat (later identified as Mohamed Jama) and another person sitting in the passenger seat." (*Id.* at ¶ 6.) The agents allegedly "ran the license plate of the

3

Target Vehicle [a white van driven by the Defendant], *which revealed it to be registered to a person without status to remain in the United States who is also deemed to be armed and dangerous.*" (*Id.* at ¶ 7. (emphasis added).) The agents allegedly assumed that the driver of the vehicle, Mr. Jama, was the registered owner of the vehicle. (*Id.* at ¶ 7.) Berger averred that agents attempted to conduct a stop of the vehicle because they believed the driver was unlawfully in the United States and removable from the country. (*Id.* at ¶¶ 7-8.)

Berger averred that the agents, who were allegedly wearing "garments identifying themselves as law enforcement," approached the vehicle while the Defendant was seated inside, and gave him verbal commands to exit the vehicle. (*Id.* at ¶ 8.) Berger alleged that the Defendant "fled" from the agents and "commit[ted] multiple traffic violations." (*Id.* at ¶¶ 9-10.) Based on the Defendant's alleged fleeing and traffic violations, the agents used their two vehicles to "attempt[] to box the Target Vehicle in so it would stop." (*Id.* at ¶ 10.) The Defendant's vehicle allegedly struck one of the Border Patrol vehicles during their attempted box-in maneuver. (*Id.* at ¶ 10.)

The Defendant was arrested via a felony warrant issued in connection with the Complaint on January 28, 2026. Then, to avoid a Rule 5.1 preliminary hearing on the Complaint, the United States filed a Misdemeanor Information on February 5, 2026. (ECF No. 18.) The Misdemeanor Information merely paraphrased the

4

statutory language of 18 U.S.C. § 111(a)(1) and did not provide any evidentiary background underlying the charge. (*Id.*)

On February 12, 2026, the initial Special Assistant U.S. Attorney ("SAUSA") assigned to the matter produced a limited set of discovery consisting of Department of Homeland Security ("DHS") Homeland Security Investigations ("HSI") reports and four body-worn camera videos taken by some of the Border Patrol agents on the scene. The majority of the HSI reports were reports of interviews by HSI agents of the Border Patrol agents that participated in the pursuit and ultimate arrest of the Defendant. In other words, the initial disclosure did not include any reports *written by* any of the Border Patrol agents that actually participated in the charged event.

The body worn cameras demonstrated that neither of the vehicles used by the Board Patrol agents to pursue and attempt to box-in the Defendant's vehicles were emergency or law-enforcement vehicles. They were rental cars. Neither vehicle had lights, sirens, or any law enforcement equipment on the interior or exterior. Both were unmarked. Notably, Agent Berger did not include any mention of the fact that the Border Patrol vehicles were unmarked rental cars without lights or sirens in the Complaint affidavit. (*See* ECF No. 1-1.)

This omission was highly relevant because Border Patrol agents are barred from engaging in any vehicular pursuit for any reason unless they are in an emergency vehicle equipped with lights and sirens. 8 C.F.R. § 287.8(e). Further,

Border Patrol agents have extremely limited law enforcement authority; they cannot pursue investigatory stops of individuals for anything other than immigration-related offenses. *See* 8 U.S.C. § 1357.

On February 13, the Court entered an arraignment order including the District's standard requirement that the Government make all disclosures required by Federal Rule of Criminal Procedure 16(a) and all disclosures required by Rules 26.2 and 12(h) by February 20, 2026.

On February 19, 2026, the United States provided a small supplement to their initial disclosures. The supplemental discovery included one additional body-worn camera video, two audio recordings of interviews of Border Patrol Agents Flores and Muniz by HSI agents (i.e., the same interviews that had previously been referenced in HSI reports), additional HSI reports (including reports related to the Defendant's arrest), and additional photographs. Other than the videos, the United States did not disclose any reports or other documentary materials from Border Patrol – the law enforcement agency involved in the charged incident.

The supplemental disclosures also did not include all the vehicle or immigration database records that the agents allegedly checked before concluding that the registered owner of the white van the Defendant was driving was allegedly removable from the United States. The only database record produced by the United States prior to the motions hearing is reproduced below (with personal information redacted). It was admitted into evidence by the United States at the motions hearing and is attached hereto as Exhibit 1:

 

The photographs in Exhibit 1 show that the United States' disclosures were deficient. The photos demonstrate that the United States had only produced record "1 of 3" from the CIS (i.e., the DHS "Central Index System" which contains the immigration and naturalization histories of all documented non-citizens). Moreover, the record that was produced was captured in a cell phone photograph of an excerpt visible on another cell phone.  Unknown content was cut off at the bottom of the screenshot.

Based on the United States' facially deficient initial disclosures, defense verbally informed the prosecution that more records must be available, and asked whether there were records demonstrating that the registered owner of the vehicle was in fact lawfully in the United States. The United States did not supplement its discovery regarding the databases allegedly checked by the Border Patrol agents prior to the motions hearing.

On March 6, 2026, the defense filed a motion for discovery in an attempt to address the United States' facially insufficient disclosures. The motion requested, among other things:

- "Computer and cell phone browsing and search histories for each DHS and CBP agent from January 20 through the date of the Misdemeanor Information related in any way to the Defendant or this case, including all histories and search quires made on the Internet, on any intranet sites

available to the agents, and on any CIS, vehicle registration, driver information, or other State or Federal database, whether or not available to the public."

- "Any and all records of any informational database reviewed, relied on, consulted, or considered by any DHS or CBP officer, or any other law enforcement officer who participated in this matter."

- "Copies of all radio traffic, dispatch records, cell phone communications, and any other communications between or among DHS agents, CBP agents, and any other law enforcement personnel regarding this incident, whether such data is stored on a government or private device or other storage media."

- "Any reports by the police, DHS, ICE, Border Patrol, or any other law enforcement agencies regarding the events disclosed in the discovery or the operational goals of the agents and officers that participated in such events."

(ECF No. 37.)

In its written response to the Motion, the United States did not provide any substantive explanation of its efforts to obtain discovery. (ECF No. 43 at 20-24.)

At the motions hearing, the defense told the Court that the key items missing from the United States' discovery were records of Microsoft Teams chat

9

communications that the Border Patrol agents used to communicate in real time and the database records the agents allegedly used to confirm that the registered owner of the vehicle was allegedly removable. (ECF No. 58, Transcript of May 4 Motions Hearing at 7-9.) The Court, through Magistrate Judge Brisbois, asked the United States to provide a further explanation of its efforts to comply with its Rule 16 discovery obligations. (ECF No. 58, Transcript of May 4 Motions Hearing at 11-25.) In response, the prosecutor stated that he had met with "Homeland Security" about discovery materials and "what I was provided is my understanding of the complete discovery based upon what Homeland Security has given me." (*Id.* at 12.) The prosecutor further asserted that "the government has disclosed database entries as it related to the predicate for the stop of the defendant's vehicle in this case." (*Id.* at 16.)

On May 18, 2026, the Court issued an order requiring the United States to produce, among other things: (a) "computer and cell phone browsing and search histories for each DHS and CBP agent related to Defendant from January 20, 2026, including all histories and search queries made on the internet, on any intranet sites available to the agents, and on any CIS, vehicle registration, driver information, or other State or Federal database, whether or not available to the public;" (b) "any and all records of any informational database reviewed, relied on, consulted, or considered by any DHS or CBP agent or other law enforcement officer who

participated in this matter"; and specifically (c) the Microsoft Teams chats that the Border Patrol agents allegedly used to verify the registered owner's immigration status and to discuss other operational details (ECF No. 57 at 4-8.)

At the motions hearing, the United States called Border Patrol Agent Muniz to testify. At the hearing, Agent Muniz testified that Border Patrol agents ran the plates on the vehicle through a "Super Query" database, which is allegedly a database that combines vehicle records, CIS records, and other information on individuals. (ECF No. 58, Mot. Hrg. Tr. at 47, 51, 63, 90-91, 96-97.) Muniz testified that the CIS records depicted in Exhibit 1 (and admitted into evidence by the United States at the motions hearing) were obtained using the "Super Query" database. Notably, however, Muniz testified that the Border Patrol agents used Microsoft Teams to verify and obtain additional records related to the registered owner's citizenship status, and that unidentified Border Patrol staff participated in the Teams chat for this purpose. (*Id.* at 51-53.) Muniz ultimately testified that he was not personally participating in the Teams chat, but that his colleague who was also on the scene, Agent Flores, was using the Teams chat and verbally informed Muniz and other agents that the Defendant was a "good target" after reviewing records exchanged on the Teams chat. (*Id.* at 85-89.) Muniz testified:

> [Cross-examination by defense] Q. Had you personally determined for yourself that you believed that the individual in this photo was in the United States illegally?
>
> A. Yes.

Q. And was that based exclusively on the information that is in this exhibit? And I can make it smaller if you want to look at it.

A. Yes. And they also confirmed from somewhere else on the Teams chat.

Q. And you don't know who that was?

A. No. There was multiple people sending different people on that chat.

Q. Okay. And we have no record of that, right?

A. It's on our government phones.

Q. Okay. But you did not provide it to the prosecutor when the prosecutor asked to you provide everything related to this incident to him, right?

A. I was not asked to provide my phone, no.

Q. You were not asked to provide everything related to this incident?

A. Not my -- not my government phone.

Q. You weren't asked to provide any information on your government phone?

A. No.

Q. And you did not provide the Teams chat?

A. No. And I believe I was not on that Teams chat. I believe the reason Agent Flores sent it was because he was the only one on that Teams chat at that time.

Q. Okay. And so you have not seen the Teams chat that you know of?

A. Yes. I've seen the Teams chat on his phone.

Q. He showed you the Teams chat?

A. On Angel Flores' phone, yes.

12

Q. Okay. And I will represent to you I don't have any Teams chat. So you understand that that is important to your decision to stop the individual, correct? Because you brought it up.

A. I mean, the only thing that the Teams chat would send is it was still active.

Q. What was active?

A. That he was – his Visa was expired. That there was no change in this basically, that there was no change on what we were seeing in front of us.

(*Id.* at 90.)

Based on the testimony and evidence admitted at the motions hearing, the Court concluded that "the Government, through its own admissions and lack of production, repeatedly demonstrated that its 'request' to CBP for the disclosure of relevant evidence did not constitute a fulsome search." (ECF No. 57 at 4-5.) The Court further noted that "Given the testifying witness was not asked to participate in the discovery process, the Court can reasonably infer that the Government did not ask any of the agents involved in the January 20, 2026 incident to search for and produce responsive information." (*Id.* at 7.)

In ordering additional discovery, specifically including the Teams chat referenced by Agent Muniz and all database queries and records consulted by the agents in connection with the charged incident, the Court ordered the government to "explain what it looked for, where it looked for it, and what it found." (*Id.* at 7.) "Further, if the Government discovers that responsive information has been deleted

13

or otherwise removed, it must explain when that information was deleted or removed and for what purpose." (*Id.* at 8.)

On June 8, 2026 – the due date set by the Court for the government to comply with its discovery order – the United States produced significant additional discovery to the defense. The prosecutor sent the defense a letter summarizing the production, a true and correct copy of which is attached as Exhibit 2 to this letter. Notably, the United State's production letter does not state that the government did the type of "fulsome" search that prosecutors ordinarily conduct before charging a federal case, and before deciding what is discoverable. Rather, the letter expressly states that prosecution merely "transmitted copies of the [Court's discovery] order to the agencies involved…[DHS and Border Patrol], as well as requested compliance from the individual agents involved." (*Id.* Ex. 2.)

The government produced one additional body-worn camera video and one additional agent cell phone video from the incident, numerous previously undisclosed reports from CBP, multiple agent text messages and emails, and critically, just two screenshots of a Teams chat. The prosecution's letter requested additional time to comply with the Court's order regarding the agents "computer and cell phone browsing and search histories," "cellphone communications" and certain other categories of discovery. (*Id.* at 1-3.) The letter further noted that "[i]t was revealed today, June 8, 2026 that Signal messages were created on January 28,

14

2026 for the coordination and operation of Defendant's arrest. Accordingly, the Government is requesting additional time for compliance with the Court's Order." (*Id.* at 3.) Thus, even after spending an additional 21 days after the Court's discovery order attempting to gather necessary discovery from DHS and Border Patrol, the government could not meet its Rule 16 discovery obligations – obligations that should have been met by February 20, 2026.

As noted, the government did produce four isolated screenshots of the Teams chat that confirmed that this prosecution was unfounded from its inception, all of which are attached hereto as Exhibit 3. Two of the screenshots reflect Agent Flores forwarding an unidentified recipient certain records related to the registered owner of the vehicle and stating "Check pls." (Ex. 3.) One of these "check" requests includes an illegible screenshot of a vehicle registration record that was not previously disclosed by the United States to the defense. (*Id.*) The other "check" request attaches a version of the screenshot of the Super Query CIS results related to the registered owner of the vehicle. (*Id.*)

Notably, these requests for a "check" of the records were timestamped at 9:15 and 9:20 a.m. – approximately two hours before Agent Berger and Agent Muniz testified that the incident began. Both Berger and Muniz testified that agents first encountered the Defendant's vehicle at approximately 11:00 or 11:15 a.m. (ECF No. 58, Mot. Hrg. Tr. at 49; ECF No. 1-1 at ¶ 5.) Based on the body-worn camera videos

15

that have been produced, the first agent to choose to activate his camera did so around 12:20 p.m., about one hour after agents said they first encountered the Defendant's vehicle.

A person on the Teams chat responded to Agent Flores's "check" at 9:22 a.m. – still hours before the agents testified that the incident began. The responses conclusively demonstrated that the registered owner of the van was a U.S. Citizen. The first response listed the registered owner's "COC" – i.e. country of citizenship – as "USA":



(Ex. 3.) The second "check" response provided further detail, along with a photograph matching the Super Query record, showing that the registered owner was a U.S. citizen with a U.S. Passport:

16



(Ex. 3.)

Thus, Agent Flores knew that the owner of the vehicle was a U.S. Citizen *before* he told his fellow agents to stop and then pursue the driver of the vehicle.

In addition to the records demonstrating that Border Patrol knew the registered owner was a U.S. Citizen, the United States supplemental disclosures included several Border Patrol reports. As noted above, the United States' prior disclosures had only included HSI reports, and no reports from Border Patrol.

Agent Flores prepared an "Enforcement Action Analysis and Reporting System (E-Star) Incident Report" that was "created" on January 20, 2026 at approximately 3:46 p.m. and "reviewed" on February 3, 2026 – well in advance of the February 20, 2026 Court-ordered deadline for the United States' Rule 16 disclosures. The United States has not offered any explanation why Border Patrol reports, including at least one report authored by the agent with primary

17

involvement in the charged incident, were not disclosed by the United States' initial discovery deadline.

After unlawfully pursuing the Defendant, the Border Patrol agents arrested him at gunpoint and handcuffed him. They placed him into one of their unmarked, civilian rental cars and transported him from St. Cloud to the Whipple federal building in Bloomington, MN. The United States' supplemental disclosures included a selfie photograph that the agents took with the Defendant during his transport to Whipple.  The photo shows two agents in their tactical gear, one masked and one unmasked, with the Defendant handcuffed in the seat next to one agent. Both of the agents are displaying a two-fingered "V" for "victory" sign with their hands in the photo.

The United States' supplemental disclosures also included numerous text messages exchanged among the agents while they were coordinating the Defendant's arrest on January 28, 2026. One text requests that the arresting agents take a "Trophy pic" with the Defendant because it is "super important to JOC," i.e. the Joint Operations Center or leadership of DHS:

When we get to the jail, can I get a couple folks in HSI vests or jackets to take a photo with their back to the camera with JAMA for me? Trophy pic is super important to JOC 🙄 and we HSI shit so FBI can't take credit.

After agents sent an initial attempt at a "trophy photo" of the Defendant on the text chain without agents clearly visible in the photo, a coordinating agent explained that a retake was needed to meet JOC's preferences:



Shortly thereafter, HSI obliged the request for a "trophy" photo depicting two HSI agents with their backs to the camera on either side of the Defendant, who was forced to face the camera while handcuffed. The photo was shared on what appears

19

to be a separate Signal chat with Kristen Draper – the individual who requested the "trophy pic." The photo garnered three heart emoji reactions from the agents on the chat.

As has been widely reported, similar "trophy" photos of individuals charged with alleged violations of 18 U.S.C. § 111 were publicized by then-Attorney General Pam Bondi on her X account in posts that are still available on the website to this day.

## III.    ARGUMENT

### A.    The Court and the Public Have a Significant Interest In Understanding and Memorializing the Reasons Underlying the United States' Motion to Dismiss this Case With Prejudice.

Although the executive branch has broad discretion whether to institute criminal proceedings, "once the [executive branch] has involved the judiciary…its discretion is tempered by the courts' independent obligations." *United States v. Adams*, 777 F. Supp. 3d 185, 205 (S.D.N.Y. 2025) (quoting *United States v. Blaszczak*, 56 F.4th 230, 237 (2d Cir. 2022) (Sullivan, J. dissenting)). Rule 48 of the Rules of Criminal Procedure therefore requires the Court to grant leave before the government may dismiss an indictment, information, or complaint.

While a judge's discretion to reject leave to dismiss is limited, Rule 48(a)'s leave requirement has been described as a "'sunshine' provision" that requires the disclosure of the prosecution's reasons for seeking dismissal." *In re Richards*, 213 F.3d 773, 788 (3d Cir. 2000). "[A]lthough the court must presume good faith on the part

20

of the prosecutor, it need not accept an 'an unsupported conclusory reason' for seeking dismissal. *Adams*, 777 F. Supp. 3d at 208.

The Court may inquire into the reasons for a government motion for dismissal consistent with its "inherent authority to ensure that its processes are not being abused." *In re Richards*, 213 F.3d at 788. Further, inquiring about the government's reasons for moving to dismiss serve's the public's "generalized interest in the processes through which prosecutors make decisions about whom to prosecute that a court can serve by inquiring into the reasons for a requested dismissal." *Id.* The public interest "argue[s] in favor of allowing a court to force prosecutors to publicly reveal their reasons for not proceeding before granting a requested dismissal." *Id.*

Thus, "a district court abuses its discretion if it does not articulate its reasons for granting or denying leave, and it cannot discharge its duties properly unless the underlying motion accurately states the government's reasons for dismissal." *Adams*, 777 F. Supp. 3d at 208. Thus, "[c]onsistent with the procedural requirements of Rule 48(a), courts have looked beyond the four corners of the motion to consider the entire record before the court—occasionally even conducting hearings—to determine if dismissal is warranted." *Id.* (collecting cases); *see also United States v. Salinas,* 693 F.2d 348, 352 (5th Cir. 1982) ("Although the burden of proof is not on the prosecutor to prove that dismissal is in the public interest, the prosecutor is under an obligation to supply sufficient reasons—reasons that constitute more than

21

'a mere conclusory interest.'"); 3A Wright, Federal Practice & Procedure § 802 (4th ed. April 2026 Update) ("Since the court must exercise a sound judicial discretion in considering a request for dismissal, it must have factual information supporting the recommendation."); *In re Richards*, 213 F.3d at 492 (the trial court was authorized to hold a hearing on the government's motion to dismiss, "especially in light of the checkered course of the case up to that point.")

Here, the United States has moved to dismiss "in the interests of justice" without providing any reason whatsoever why it wasted judicial resources and turned the Defendant's life upside down, first with a felony complaint and then with a misdemeanor information. The government inexplicably failed to meet its discovery obligations by conducting a through search for records within the United States' control that were disclosable under Rule 16, Rule 12(h), *Brady, Giglio,* and related case law and rules.

Now that the government has provided additional disclosures that demonstrate that its prosecution was fundamentally flawed from the start, it is attempting to sweep the relevant facts under the rug by claiming dismissal "in the interests of justice" without acknowledging its mistakes and failures. The facts described above demonstrate that Agent Flores knew that the registered owner of the vehicle the Defendant was driving was a U.S. Citizen, and that he had no lawful basis or reasonable suspicion to tell his fellow agents to attempt to conduct an

22

investigative *Terry* stop of the Defendant. *See Kansas v. Glover*, 589 U.S. 376, 386 (2020) (Although Border Patrol officers may base their suspicion to conduct a stop in part based on information that the registered owner of the vehicle is unlawfully in the United States, a stop is not justified if "the presence of additional facts might dispel reasonable suspicion.") The agents then engaged in an unlawful vehicular pursuit of the Defendant without the authority to do so; they pursued in unmarked rental vehicles without lights or sirens and did not have the authority to arrest the Defendant for state law traffic violations. *See* 8 U.S.C. § 1357. They caused an accident, blamed the Defendant, and then attempted to humiliate him by taking selfies and eventually "trophy" photos.

The Court and the public have a significant interest in documenting the government's failures and attempting to deter the government from engaging in the same unlawful conduct in future cases. Accordingly, the Court should enter an order dismissing this case with prejudice and requiring the United States to either appear at a hearing or submit a written response explaining the reasons underlying its decision to move to dismiss.

Once the Court is satisfied it has received a truthful recitation of the reasons underlying the government's motion, the Court should enter an order reciting the reasons for the dismissal, to include:

23

(1) that Border Patrol agents knowingly attempted to engage in immigration enforcement against an individual who they believed to be a U.S. Citizen;

(2) that agents unlawfully engaged in a vehicular chase of the Defendant using unmarked civilian rental cars without lights or sirens, in violation of federal law and outside their authority as Border Patrol agents;

(3) that agents unlawful conduct caused a traffic accident that the agents then blamed on the Defendant; and

(4) that agents unnecessarily took selfies and "trophy" photos with the Defendant for the purpose of embarrassing the defendant and attempting to sway public opinion related to Operation Metro Surge.

Additionally, the Court should consider entering an order finding that Agents Berger and Muniz provided false or recklessly inaccurate testimony, and that Agent Flores acted dishonestly. Agent Berger's own credibility has now been called into question by this Court, as has the veracity of information provided to him by other agents. *See United States v. Etherington*, 26-mj-58 (ECF No. 52) (Schultz, M.J.); *United States v. Adbebe*, 26-mj-77 (Mot. Hrg.) (Cowan Wright, M.J.).

Agent Berger either intentionally provided false testimony regarding the registered owner's immigration status or he was mislead by Agent Flores. In either instance, one or both of the Agents' dishonesty should be documented for purposes of later *Giglio* disclosures. These agents should not be allowed to testify in future

24

proceedings or affidavits without their prior dishonesty being recognized by the Court and disclosed to future defendants.

Agent Muniz also testified that he personally looked that the Teams chat records checks and personally concluded that the registered owner was not a U.S. citizen. In light of the clear records shared on the Teams chat demonstrating that the registered owner was a U.S. citizen, the Court should confirm that Muniz also provided false testimony.

Respectfully submitted,

Dated: June 25, 2026        **DORSEY & WHITNEY LLP**

s/ Surya Saxena

Surya Saxena, Reg. No. 0339465
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402
612-340-2600

Attorneys for Defendant

25