**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Mohamed Abdirizak Jama,

Defendant.

Case No. 26-mj-53 (MJD/LIB)

**REPORT AND RECOMMENDATION**

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provisions of Title 28 U.S.C. § 636 upon the Government's Motion to Dismiss, [Docket No. 63]. The Court held a Motions Hearing on September 1, 2026. [Docket No. 71].

For the reasons discussed herein, the Court recommends the Government's Motion to Dismiss, [Docket No. 63], be **GRANTED**, and that the dismissal be with prejudice.

## I. Procedural Background

On January 23, 2026, in reliance on Department of Homeland Security Special Agent Richard Berger's (hereafter "SA Berger") Affidavit, the Government obtained a felony complaint charging Mohamed Abdirizak Jama (hereafter "Defendant")[1] with one (1) count of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with federal officers designated in 18 U.S.C. § 1114 while engaged in, or on account of, the performance of their official duties, and that such acts involved the use of a deadly or dangerous weapon, in violation of 18

---

[1] Defendant is, and at all times at issue herein was, a United States citizen.

U.S.C. §§ 111(a)(1) and 111(b). (Complaint [Docket No. 1]). On January 28, 2026,[2] Defendant was re-arrested pursuant to a felony warrant issued in connection with the Complaint. (Bench Warrant [Docket No. 2]).

On February 5, 2026, the Government filed a Misdemeanor Information charging Defendant with one (1) count of forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with federal officers designated in 18 U.S.C. § 1114, "to wit: a Customs and Border Protection employee, while such officer and employee was engaged in and on account of the performance of official duties, all in violation of Title 18, United States Code, Section 111(a)(1). (Misdemeanor Information [Docket No. 18]).

On February 12, 2026, the Government produced a limited set of discovery. (Def.'s Response [Docket No. 66] at 5). This disclosure consisted of Department of Homeland Security (hereafter "DHS") and Homeland Security Investigations (hereafter "HSI") reports and four body-worn camera videos worn by some of the Border Patrol agents (hereafter "BPA") who were present on the day of Defendant's initial arrest on January 20, 2026. (Id.).

On February 13, 2026, the undersigned entered an Arraignment Order, [Docket No. 25], which, in relevant part, ordered the Government to make all disclosures required by Federal Rule of Criminal Procedure 16(a) and encouraged all disclosures under Federal Rules of Criminal Procedure 26.2 and 12(h) by February 20, 2026. (Arraignment Order [Docket No. 25] ¶ 1).

On February 19, 2026, the Government supplemented their initial disclosures with one additional body-worn camera video; two audio recordings of interviews of Border Patrol agents

[2] The operative events, including the initial identification of Defendant, any and all "checks" ran by Immigration Agents, the vehicular pursuit, Defendant's initial immigration arrest by ICE, and Defendant's transport to the Whipple Building, occurred on January 20, 2026.

Angel Flores (hereafter "BPA Flores") and Marco Antonio Muniz (hereafter "BPA Muniz");[3] additional HSI reports; and additional photographs. (Def.'s Response [Docket No. 66] at 14).[4]

On March 6, 2026, Defendant filed a Motion to Dismiss for Outrageous Government Conduct, [Docket No. 34]; Motion to Dismiss for Failure to State an Offense or for a Bill of Particulars, [Docket No. 35]; Motion to Suppress Stop and Arrest, [Docket No. 36]; and Motion for Discovery, [Docket No. 37].

At the May 4, 2026, Motions Hearing on Defendant's pre-trial motions, it became apparent to the Court that the Government had <u>failed</u> to fulfill its discovery obligations prior to the hearing. For example: (1) the Government had produced only five body-worn camera videos when it was undisputed that there were several additional agents involved in the January 20, 2026, incident; (2) BPAs relied heavily on the results of a Secure Query in approaching Defendant to allegedly inquire about his immigration status, yet the Government produced only page "1 of 3" of the results of the Secure Query; (3) there was no production of any radio traffic and dispatch records, which the Government counsel represented was due to a combination of not locating any records, not looking everywhere for such records, and/or not knowing or checking whether those records existed; (4) although BPA Muniz, who was present for and participated in the events on January 20, 2026, clearly testified under oath to the use of a Teams chat in facilitating communications, <u>no</u> Teams messages had been produced; and (5) prior to the hearing, BPA Muniz was never asked by Government counsel as part of pretrial discovery to produce his government phone which he admittedly used during the relevant events on January 20, 2026. (Order [Docket No. 57] at 7).

---

[3] BPA Flores and BPA Muniz were present for and participated in the events surrounding Defendant's arrest on January 20, 2026. BPA Muniz additionally testified at the May 4, 2026, Motions Hearing.

[4] At that time, the only database record produced by the Government were screenshots of page "1 of 3" of a Secure Query. (Def.'s Response [Docket No. 66] at 8).

Based on these clear and numerous discovery deficiencies, the undersigned issued an Order on Defendant's Motion for Discovery, [Docket No. 37], on May 18, 2026, which ordered the Government to supplement their initial disclosures through producing additional documents responsive to Defendant's discovery requests. The exact production ordered by this Court, and the results thereof, will be explored further herein.

On June 8, 2026, the deadline the undersigned had set for the Government to comply with the supplemental discovery Order, the Government produced some limited additional discovery. The Government provided Defendant with a letter listing the additional discovery produced, including (1) one additional body-worn camera video and one cell phone video; (2) CBP reports; (3) multiple text messages and emails between CBP agents; and (4) several screenshots from a Teams chat. (Def.'s Ex. 2 [Docket No. 66-2] at 3–5).[5] On June 8, 2026, the Government also requested additional time to yet more fully comply with this Court's Order for discovery as it was unable to fully compile and produce the ordered discovery by the Court imposed deadline. (Id. at 3, 4).

However, instead of further fully complying with its discovery obligations, two days after it had produced the prior limited supplemental discovery, the Government filed the present Motion to Dismiss with Prejudice on June 10, 2026, [Docket No. 63], pursuant to Federal Rule of Criminal Procedure 48(a). The Government's Motion to Dismiss, in full, provides simply:

> The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and William L. Richards, Special Assistant United States Attorney, hereby requests that the Court dismiss this case in the interest of justice, with prejudice, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure.

[5] Defendant's Exhibit 2, as attached to Defendant's Response and admitted to the record without objection at the September 1, 2026, Hearing on the Government's Motion to Dismiss, is the Government's letter to Defendant summarizing its supplemental production following this Court's discovery Order. (Def.'s Ex. 2 [Docket No. 66-2] at 3–5; Digital Recording, 2:22–2:24). Defendant's Exhibit 3 also admitted without objection consists of four screenshots of a CBP agent Teams chat. (Def.'s Ex. 3 [Docket No. 66-3]; Digital Recording, 2:22–2:24).

(Mot. to Dismiss [Docket No. 63]).

On June 25, 2026, Defendant submitted a Memorandum in Response to the Government's Motion to Dismiss, [Docket No. 66], in which he agreed that this matter should be dismissed with prejudice. However, Defendant, based on alleged unlawful conduct and discovery deficiencies by the Government in the present case and in an attempt to deter the Government from engaging in the same alleged unlawful conduct in the future, also requested that the Court require the Government to either appear at a hearing or submit a written response explaining the reasons underlying its decision to move to dismiss. (Def.'s Response [Docket No. 66] at 23).[6]

On June 26, 2026, the Honorable United States District Court Judge Michael J. Davis referred the Government's Motion to Dismiss to the undersigned to review the factual issues raised by Defendant in his Response. (Order [Docket No. 67]). The undersigned scheduled a Motions Hearing on the Government's Motion to Dismiss, [Docket No. 63], for September 1, 2026. (Order [Docket No. 68]).

At the September 1, 2026, Motions Hearing, the Government offered only very limited oral argument and no witness testimony in response to Defendant's allegations regarding the Government witness's potential perjury and the Government's discovery deficiencies. Additionally, Defendant formally admitted into the record without objection Exhibit 1, the two screenshots of page "1 of 3" of the Secure Query; Exhibit 2, the Government's letter to Defendant

[6] Defendant additionally requested that, once the Court is satisfied with the Government's recitation, the Court should enter an order reciting the Government's reasons for dismissal, including: (1) that Border Patrol agents knowingly attempted to engage in immigration enforcement against an individual who they believed to be a U.S. Citizen; (2) that agents unlawfully engaged in a vehicular chase of the Defendant using unmarked civilian rental cars without lights or sirens, in violation of federal law and outside their authority as Border Patrol agents; (3) that agents unlawful conduct caused a traffic accident that the agents then blamed on the Defendant; and (4) that agents unnecessarily took selfies and "trophy" photos with the Defendant for the purpose of embarrassing the Defendant and attempting to sway public opinion related to Operation Metro Surge. (Def.'s Response [Docket No. 66] at 23, 24). Finally, Defendant requested the Court consider entering an order finding SA Berger and BPA Muniz provided false or recklessly inaccurate testimony, and that Border Patrol Agent Flores acted dishonestly. (Id. at 24).

summarizing its supplemental production following this Court's discovery Order; and Exhibit 3, four screenshots of the CBP agents' Teams chat.[7] (Digital Recording, 2:22–2:24).

In light of additional issues raised by the Honorable United States Magistrate Judge Leo I. Brisbois during the September 1, 2026, Motions Hearing, the parties were granted the opportunity to file an optional list of supplemental legal authorities with the Court. (Minute Entry [Docket No. 71]). The Court took Defendant's Motion under advisement thereafter. (Id.).

## II. Standard of Review

Federal Rule of Criminal Procedure 48(a) "requires a prosecutor to obtain leave of court in order to terminate a prosecution by dismissal[.]" United States v. Salinas, 693 F.2d 348, 350 (5th Cir. 1982) (citing Fed.R.Crim.P. 48(a)). Rule 48(a) specifically provides that "[t]he Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate."

## III. Analysis

As previously noted, Defendant does not oppose the Government's Motion to Dismiss. Rather, Defendant argues that while this case should be dismissed with prejudice, the Government's cursory statement that dismissal with prejudice is "in the interests of justice" fails to adequately disclose why the Government is not pursuing prosecution. (Gov't.'s Response [Docket No. 66] at 1). As such, Defendant, through his Memorandum, provided factual context relating to the BPAs' actions during the events of January 20, 2026, and the Government's deficient discovery production, to aid the Court in its decision of whether it should conduct a

[7] Importantly, two of these screenshots are the results of two "checks" BPA Flores submitted to the CBP agents' Teams chat. (Def.'s Ex. 3 [Docket No. 66-3] at 3). The results of these "checks," as provided by an individual identified only as Kaddisha Meneses, identified the vehicle registrant's "COC" as "USA," and, under "Overstay Status," listed "N/A," and then further identified the vehicle registrant as a U.S. Citizen with a U.S. Passport. (Id.).

further inquiry into the Government's conduct, and whether it should issue an Order memorializing that conduct.

In opposition, the Government contends that given Defendant agrees that this matter should be dismissed with prejudice, there is no longer a live case or controversy. (Gov't.'s Reply [Docket No. 70] at 2). As such, the Government requests the Court summarily dismiss this matter with prejudice but without any further factual findings. (Id.).

As will be explored further herein, this Court finds that the present prosecution has been replete with blatant contradictions and deficient discovery. In consideration of this finding, the Court finds the Government's bare request that dismissal with prejudice is "in the interest of justice" to be woefully inadequate. See, e.g., Salinas, 693 F.2d at 352 (". . . the prosecutor is under an obligation to supply sufficient reasons—reasons that constitute more than 'a mere conclusory interest.'") (quoting United States v. Hamm, 659 F.2d 624, 631 fn. 23 (5th Cir. 1981)); United States v. Ahmed, 837 F. Supp. 3d 985, 989 (D. Minn. 2026) ("As other courts have recognized, the Government must provide some justification for its decision to dismiss a case in order to guard against prosecutorial harassment."); United States v. Adams, 777 F. Supp. 3d 185, 208 (S.D.N.Y. 2025) ("The reason for requiring the government to state its actual reasons for seeking dismissal is simple: 'Since the court must exercise sound judicial discretion in considering a request for dismissal, it must have sufficient factual information supporting the recommendation.'") (quoting 3B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 802 (4th ed. June 2024 update)).

As a result, it is well within this Court's authority to document the factual information surrounding the Government's decision to abandon prosecution of the present case. See, e.g., United States v. Ammidown, 497 F.2d 615, 620 (D.C. Cir. 1973) ("[Rule 48(a)] contemplates

exposure of the reasons for dismissal in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors, and in pursuance of this purpose, to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial.") (quotations omitted); United States v. Derr, 726 F.2d 617, 619 (10th Cir. 1984) (". . . the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision.")

As such, the following is this Court's recitation of the information on the present record, including, but not limited to, inconsistencies and contradictions within SA Berger's Affidavit; BPA Muniz and BPA Flores' conduct on January 20, 2026; instances of potential perjury throughout BPA Muniz's testimony at the May 4, 2026, Motions Hearing; and the Government's repeated clear failures to comply with its prosecutorial discovery obligations.

**A. Affidavit and Testimony Inconsistencies and Potential BPA Misconduct**

As previously noted, the Government initially obtained a felony complaint charging Defendant pursuant to 18 U.S.C. §§ 111(a)(1) and 111(b) in reliance on SA Berger's Affidavit. However, as was revealed during the May 4, 2026, Motions Hearing, as well as, the Government's supplemental discovery production, SA Berger's Affidavit, as well as BPA Muniz's testimony, are littered with blatant contradictions concerning potential misconduct exhibited by BPA Muniz and BPA Flores.

First, SA Berger attested by affidavit to the Court that on January 20, 2026, on or around 11:15 a.m., the BPAs ran the license plate of a white van that they observed in an apartment complex parking lot. (Aff. in Supp. [Docket No. 1-1] ¶¶ 5, 6). SA Berger then attested that upon running the license plate,[8] the BPAs learned the vehicle was "registered to [a] person without status

[8] Notably, there has been no documentation offered by the Government outlining what the BPAs did to "check" the vehicle's license plates: "**Defense:** And we have no record of whatever you did to check the plates of that vehicle,

to remain in the United States who is also deemed armed and dangerous," and that the BPAs believed the individual within the vehicle, who was later identified as Defendant, was the person referenced as "armed, dangerous, and removable from the United States." (Id. ¶ 7).

BPA Muniz affirmed this sequence of events through his testimony at the May 4, 2026, Motions Hearing. BPA Muniz testified that on January 20, 2026, around 11:00 a.m., BPA Muniz, along with his fellow BPAs, observed a white van in an apartment complex parking lot. (Transcript [Docket No. 58] at 49).[9] BPA Muniz then explained that the BPAs ran a license plate check on the vehicle, the results of which were sent through the BPA Teams chat by BPA Flores for "more in-depth research." (Tr. 51). BPA Muniz further testified that this additional "research" revealed that the owner of the vehicle was "armed and dangerous" and was "here illegally in the United States." (Tr. 51, 52). BPA Muniz specifically testified that the results showed a "Visa overstay." (Tr. 53).

In reality, contrary to BPA Muniz's testimony, BPA Flores' "checks" were actually sent to the CBP Teams chat on January 20, 2026, at 9:15 and 9:20 a.m. (Def.'s Ex. 3 [Docket No. 66-3] at 2). However, also contrary to BPA Muniz's testimony, an individual identified as Kaddisha Meneses responded to BPA Flores' first "check" in the CBP agents' Teams chat at 9:22 a.m. and identified the vehicle registrant's Country of Citizenship (hereafter "COC") as "USA," and, under "Overstay Status," listed "N/A." (Def.'s Ex. 3 [Docket No. 66-3] at 3). Kaddisha Meneses' response to the second "check," which was sent at 9:27 a.m., indicated the vehicle registrant was a U.S. Citizen with a U.S. Passport. (Id.). Given both SA Berger's Affidavit and BPA Muniz's testimony confirm the Secure Query, BPA Flores' two "checks" sent to the CBP Teams chat and

---

right? **BPA Muniz:** Not to my knowledge. **Defense:** Okay. You have not seen any such records, right? **BPA Muniz:** No, I have not. **Defense:** You did not preserve the vehicle registration checks that you conducted on that date, right? **BPA Muniz:** No." (Tr. 97).

[9] Throughout this Report and Recommendation, the Court refers to the transcript of the May 4, 2026, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 58]).

responses thereto were completed before the BPAs approached Defendant, the BPAs on scene that day had information that the vehicle registrant was a lawful United States citizen before any of the BPAs even approached Defendant.[10]

Further, the timeline of the "checks" by BPA Flores (the only evidence of "checks" produced by the Government in discovery) and their results are vastly different from the timeline described by both SA Berger and BPA Muniz. Based on the body-worn camera footage, the first BPA to activate his camera on January 20, 2026, did so around 12:22 p.m. (Def.'s Ex. 2).[11] As such, based on the received responses to BPA Flores' two "checks," the BPAs knew the vehicle in the apartment complex parking lot was registered to a U.S. citizen for approximately three hours[12] prior to the BPAs even first approaching the vehicle.[13]

Next, SA Berger, when relaying the events leading up to the vehicle collision on January 20, 2026, attested in his affidavit that after Defendant had driven away from the BPAs, "the BPAs saw the Target Vehicle commit multiple traffic violations" and "drive in a dangerous manner," so

---

[10] Whether or not BPA Flores directly shared the results of these "checks" with BPA Muniz or the other BPAs is not entirely clear. BPA Muniz did explicitly agree that he had personally determined for himself that he believed the individual on the "checks" was in the United States illegally. (Tr. 89). However, BPA Muniz did not testify that he could have personally confirmed the vehicle registrant's immigration status through any "check" results any way other than the two "checks" ran through the CBP Teams chat by BPA Flores.

[11] Defendant's Exhibit 2 is BPA Nunn's body-worn camera footage taken during the events on January 20, 2026. (See, Def.'s Ex. 2; Tr. 34). At the May 4, 2026, Motions Hearing, Defendant, without objection, offered the recording into evidence as Defendant's Exhibit 2. (Tr. 36).

[12] The Court finds this time discrepancy especially alarming given BPA Muniz testified that it took "about maybe three minutes, four minutes" to conduct the "checks," and then the officers observed Defendant leaving the vehicle. (Tr. 83). As such, BPA Muniz's testimony is not truthful because about three hours had elapsed between BPA Flores running the two "checks" through the CBP Teams chat, the BPAs parking their vehicle, and the BPAs exiting that vehicle to approach Defendant, who was parked directly in front of them.

[13] Notably, BPA Muniz's testimony regarding when he believed Defendant was the individual identified in the "checks" varies. First, BPA Muniz testified that the BPAs were not able to see Defendant or the other vehicle occupant until Defendant drove away from the BPAs. (Tr. 82). BPA Muniz specifically noted that the agents were unable to see the vehicle occupants' faces or their skin color "until we were following them after they took off." (Tr. 81, 82). Later, BPA Muniz testified that he identified Defendant as the individual in the "checks" when Defendant got out of the vehicle. (Tr. 83). SA Berger, however, attested that, at the time the BPAs ran the "checks," and before Defendant exited the vehicle and any BPAs approached Defendant and the vehicle, "the BPAs believed the Target Vehicle's driver to be the person referenced as armed, dangerous, and removable from the United States." (Aff. In Supp. [Docket No. 1-1] ¶ 7).

the BPA vehicles attempted to "box the Target Vehicle in so it would stop." (Affidavit in Supp. [Docket No. 1-1] ¶ 10).[14] Notably, SA Berger attested that this occurred before Defendant's vehicle collided with a BPA vehicle. (Id. ¶ 12). BPA Muniz, however, testified at the hearing that the BPAs attempted to box in Defendant's vehicle only after the collision occurred:

> **Defense:** All right. So you tried to box in the vehicle?
> **BPA Muniz:** After the fact that it rammed into us.
> **Defense:** All right. So your testimony is that you and your support vehicle did not attempt to box in the vehicle until after the collision?
> **BPA Muniz:** Correct.

(Tr. 119). Defendant, then, referenced Impeachment Exhibit 1,[15] where BPA Muniz himself contradicts his May 4, 2026, testimony:

> So the backup gets there, and they tell us they are going to try to box it in. So we're able to overtake the van, get in front of it. Somehow he got behind us and -- when we were in front of him, he gets behind us and clips us on the back -- no, he clips us in the front. Sorry.

(Tr. 119). Clearly, BPA Muniz has not accurately portrayed the order of crucial events as they occurred on January 20, 2026.

Next, at the May 4, 2026, Motions Hearing, BPA Muniz testified that he participated in the transport of Defendant to the Whipple Federal Building in Bloomington, Minnesota (hereafter "Whipple") following Defendant's arrest. (Tr. 133). BPA Muniz specifically testified that he did not "recall" himself or his colleagues taking trophy "selfie photographs" with Defendant during his transport to Whipple. (Tr. 133). The Government's supplemental disclosures, however, included a selfie photograph that the BPAs took with Defendant during his transport to Whipple.

---

[14] Importantly, BPA Muniz's testimony at the May 4, 2026, Motions Hearing confirmed that, as BPAs who were not coordinating with state and local law enforcement, BPA Muniz and his colleagues did not have the authority to initiate a traffic stop on the basis of traffic violations. (Tr. 126). Even more troubling is that while BPA Muniz and his colleagues were unlawfully attempting to box in Defendant's vehicle, they were driving in an unmarked civilian rental car, specifically, a Chevy Suburban with a Texas license plate and no lights or sirens. (Tr. 100–102).

[15] Defendant's Impeachment Exhibit 1 is the recording of BPA Muniz's interview with HSI following the events of January 20, 2026. (Tr. 105, 106). At the Motions Hearing, Defendant, without objection, offered the recording into evidence as Defendant's Impeachment Exhibit 1. (Tr. 105, 106).

(Def.'s Response [Docket No. 66] at 18). The photo depicts Defendant handcuffed in his seat along with two BPAs in tactical gear, both of which are displaying a two-fingered "V." (Id.).[16]

Finally, the Court notes one final overarching, and extremely concerning, inaccuracy that plagues the entirety of the events on January 20, 2026. Defendant was not the owner of the vehicle he was driving on January 20, 2026. (Tr. 143, 144). As such, Defendant was not the individual identified in the any of the "checks," including the Secure Query results and the two "checks" ran by BPA Flores through the CBP Teams chat. (See, Def.'s Exs. 1 & 3 [Docket Nos. 66-1, 66-3]). The man identified in these aforementioned "checks" is named Abdirashid Adan. (Tr. 139).[17] Mr. Adan legally entered the United States in 2000 with refugee status, and was later naturalized as a United States citizen in 2007. (Tr. 140). Importantly, at no point between entering the United States and becoming a United States citizen was Mr. Adan in the United States illegally. (Tr. 143). Additionally, as Mr. Adan testified at the May 4, 2026, Motions Hearing, without objection and without cross-examination, Mr. Adan has never been arrested for any crime at all nor has he had any encounter with law enforcement that would result in a label of "armed and dangerous." (Tr. 143).

Given Mr. Adan's refugee status only "expired" because he had already been naturalized as a United States citizen, and given Mr. Adan has no criminal history to warrant a label of "armed and dangerous," the Secure Query results, which the BPAs supposedly relied upon, which indicates that Mr. Adan's refugee status was expired, and labels him "ARMED & DANGEROUS," are not merely misleading, they are blatantly false. The Secure Query results, along with the contrary results of the two "checks" ran by BPA Flores through the Teams chat, call in to question

[16] Defendant contends this two fingered "V" represents "victory." (Def.'s Response [Docket No. 66] at 18). The Government does not deny this assertion anywhere in its Reply. (See, Gov't.'s Reply [Docket No. 70]).
[17] Mr. Adan is Defendant's employer. (Tr. 143, 144). Mr. Adan is a diesel mechanic, and allows his employees to use his fleet of eight trucks for parts transportation or to run errands around town. (Tr. 143, 144).

the validity of not only BPA Muniz's actions on January 20, 2026, but also those of every Immigration Agent who claims they relied that day on the same absurdly flawed database.

The Court is cognizant of its limitations regarding the imposition of actual, concrete repercussions on SA Berger, BPA Muniz, and BPA Flores. See, e.g., Munt v. Larson, No. 15-cv-582 (SRN/SER), 2015 WL 5673087, at *9 (D. Minn. July 30, 2015), report and recommendation adopted in part, rejected in part, 2015 WL 5673108 (D. Minn. Sept. 23, 2015) (". . .the Court has no authority to pursue perjury charges against [a witness].") (citing United States v. Giannattsio, 979 F.2d 98, 100 (7th Cir.1992) ("A judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them. Prosecutorial discretion resides in the executive, not in the judicial, branch . . . ."); Hankins v. Selig, No. 4:09-cv-00323 (GTE), 2009 WL 3248012, at *8 (E.D. Ark. Oct. 7, 2009) (". . .this Court lacks the authority to launch a criminal investigation, to cause criminal charges to be brought, to impose sanctions, or to dismiss these defendants from their positions as state court judges or prosecutors.").

However, in consideration of the litany of actual falsities and contradictions within SA Berger's Affidavit in support of the initial Complaint and BPA Muniz's May 4, 2026, hearing testimony, as well as, BPA Muniz's and BPA Flores' highly suspect conduct in pursuing Defendant on January 20, 2026, this Court finds there is at least (1) a reasonable basis to believe there is probable cause SA Berger engaged in misconduct through falsely authoring his Affidavit submitted to the Court; and (2) a reasonable basis to believe there is probable cause BPA Muniz perjured himself through his testimony at the May 4, 2026, Motions Hearing.

As such, while acknowledging this Court lacks the authority to initiate a criminal investigation, cause criminal charges to be brought, impose personal sanctions, or terminate SA Berger, BPA Muniz, or BPA Flores from their current government employment, this Court

recommends the United States Attorney's Office be strongly encouraged to undertake an investigation into SA Berger, BPA Muniz, and BPA Flores regarding their actions surrounding Defendant's initial pursuit and arrest by ICE, as well as, their subsequent submissions and testimony to the Court.

**B. Discovery Deficiencies**

As the Court outlined above, as well as, in its Order on Defendant's Motion for Discovery, it became apparent at the May 4, 2026, Motions Hearing that the Government failed to conduct a fulsome search for information responsive to Defendant's discovery requests. (Order [Docket No. 57] at 7). In consideration of this failure, the undersigned ordered the Government to supplement their initial disclosures with documents responsive to Defendant's discovery requests including, but not limited to, the following categories: (1) copies of all cell phone video and body-worn camera footage from all agents and officers related to Defendant's case; (2) computer and cell phone browsing and search histories for each DHS and CBP agent related to Defendant's arrest; (3) any and all records of any informational database reviewed, relied on, consulted, or considered by any DHS or CBP agent or other law enforcement officer; (4) copies of all radio traffic, dispatch records, cell phone communications, and any other communications between or among DHS agents, CBP agents, or any other law enforcement personnel regarding the incident, and whether such data is stored on a government or private device or other storage media; and (5) any and all audio, photos, videos, emails, booking and arrest records, evidence of chain of custody logs, and any documented verbal conversations related to this matter. (See, Order [Docket No. 57]). This Court additionally instructed the Government to provide Defendant with an explanation of what the Government looked for, where it looked for it, and what it found, and if the Government

discovered responsive information had been deleted or otherwise removed, it was to explain when that information was deleted or removed and for what purpose. (Id. at 7, 8).

On June 8, 2026, the Court imposed deadline for the Government's compliance with this Court's Order, the Government provided Defendant with a letter itemizing its limited supplemental production to date. (See, Def.'s Ex. 2 [Docket No. 66-2]). The Government's letter also generally requested more time to further comply with the production of (1) "computer and cell phone browsing and search histories for each DHS and CBP agent;" (2) "all records of any informational database reviewed, relied on, consulted, or considered by any DHS or CBP agent or other law enforcement officer;" (3) "cellphone communications, and any other communications between or among DHS agents, CBP agents, and any other law enforcement personnel regarding the incident;" and (4) "any and all photographs, text messages, emails, chats, or other cell phone data depicting any of the aforementioned law enforcement officers." (Id. at 2, 3). Notably, the Government's June 8th letter did not provide Defendant with any of the required explanation regarding what the Government looked for, where it looked for it, and what it found, or whether any information had been deleted or otherwise removed.

The Government, to date, has not produced any further discovery, nor has it provided Defendant with any explanation regarding what the Government looked for, where it looked for it, and what it found, or whether any information had been deleted or otherwise removed. Instead, the Government filed the present Motion to Dismiss, [Docket No. 63], on June 10, 2026, only two days after its June 8th letter acknowledged it ongoing discovery deficiencies.

The following is a recitation of the Government's failures to comply with its discovery obligations in the present case. The Court finds this non-compliance especially important

considering there is strong evidence on the record, as outlined above and explained further below, that the Government is utilizing dismissal in order to avoid its prosecutorial discovery obligations.

As an initial matter, the Court addresses the Government's numerous attorney substitutions preceding the May 4, 2026, Motions Hearing. The initial Complaint, [Docket No. 1]; the Government's Amended Motion to Seal, [Docket No. 5]; and the Government's Motion for Correction, [Docket No. 13], were filed by Assistant United States Attorney (hereafter "AUSA") Kristian C.S. Weir. The Government's initial Motion to Seal, [Docket No. 3], was filed by AUSA Matthew D. Evans. Thirteen days after the filing of the Complaint, on February 5, 2026, Special Assistant United States Attorney (hereafter "SAUSA") Michael Hakes-Rodriguez filed a Notice of Substitution, [Docket No. 16], substituting himself for AUSA Matthew D. Evans. On March 6, 2026, Defendant filed his Motion for Discovery, [Docket No. 37]. One month later, on April 6, 2026, SAUSA William L. Richards filed a Notice of Substitution, [Docket No. 48], substituting himself for SAUSA Michael Hakes-Rodrguez. On May 4, 2026, the day of the Motions Hearing, SAUSA Robert G. Tucker filed a Notice of Appearance as Co-Counsel, [Docket No. 54]. Both SAUSA William L. Richards and SAUSA Robert G. Tucker appeared on behalf of the United States on May 4, 2026. (Minute Entry [Docket No. 55]).[18]

At the May 4, 2026, Motions Hearing, the Government demonstrated that it had failed to fulfill its discovery obligations.

First, the Government produced only five body-worn camera videos as of the date of the Motions Hearing. (Tr. 7). It was, however, undisputed that there were additional agents involved in the January 20, 2026, incident. As such, the Government relented that it would make "a more

[18] On August 18, 2026, SAUSA Nicholas R. Grey filed a Notice of Substitution, [Docket No. 69], substituting himself for SAUSA Robert G. Tucker. The Court emphasizes that though SAUSA Nicholas R. Grey did appear on behalf of the United States at the September 1, 2026, Motions Hearing, SAUSA Grey was <u>not</u> the attorney of record at any point prior to or during the May 4, 2026, Motions Hearing.

formalized disclosure to the Defense" relating to the body-worn camera footage. (Tr. 25). The Government's limited supplemental production then resulted in the production of only some additional body-worn camera video without any explanation as to the whereabouts or efforts to locate and obtain others. (See, Def.'s Ex. 2 [Docket No. 66-2] at 6).

Second, BPA Muniz clearly testified at the May 4, 2026, hearing to the BPAs' use of a Teams chat in facilitating relevant communications on January 20, 2026. (Tr. 51). However, as of the date of the Motions Hearing, the Government had failed to produce any communications from this Teams chat. (Tr. 90). The Government's limited supplemental production then resulted in the production of some additional screenshots of Teams chat communications. (See, Def.'s Ex. 2 [Docket No. 66-2] at 6).[19]

Third, at the May 4, 2026, Motions Hearing, the Government initially argued that it had produced all reports generated in relation to the January 20, 2026, incident. (Tr. 10). However, when the Court specifically inquired as to whether the Government was certain that none of the agents involved in the January 20, 2026, incident, authored any of their own reports, the Government asserted it had made requests as to the existence of that information, but that it's assertion came with a "caveat," and that further "endeavors" would need to be undertaken to ensure all relevant reports are produced. (Tr. 12). The Government's limited supplemental production then resulted in the production of numerous additional reports from CBP, including one by Agent Flores titled "Enforcement Action Analysis and Reporting System (E-Star) Incident Report" which

[19] Notably, as discussed above, two of these newly discovered screenshots are the responses to the two "checks" that were run prior to approaching Defendant, and which had identified the vehicle registrant's "COC" as "USA," and, under "Overstay Status," listed "N/A," and then further identified the vehicle registrant as a U.S. Citizen with a U.S. Passport. (Def.'s Ex. 3 [Docket No. 66-3] at 3), in direct contradiction to SA Berger's submitted affidavit and BPA Muniz's hearing testimony.

was created on January 20, 2026, and reviewed on February 3, 2026. (Def.'s Response [Docket No. 66] at 14, 17; Def.'s Ex. 2 [Docket No. 66-2] at 6).

Lastly, and most troubling, is BPA Muniz's hearing testimony regarding a lack of the Government attorney's discovery efforts:

> **Defense:** Had you personally determined for yourself that you believed that the individual in this photo was in the United States illegally?
> **BPA Muniz:** Yes.
> **Defense:** And was that based exclusively on the information that is in [Gov't. Exs. 2 and 3]?
> . . . .
> **BPA Muniz:** Yes . . . they also confirmed from somewhere else on the Teams chat.
> **Defense:** You don't know who that was?
> **BPA Muniz:** No there was[sic] multiple people sending different people on that chat.
> **Defense:** Okay, and we have no record of that, right?
> **BPA Muniz:** It's on our Government phones.
> **Defense:** Okay, but you did not provide it to the prosecutor when the prosecutor asked you to provide everything related to this incident to him, right?
> **BPA Muniz:** I was not asked to provide my phone, no.
> **Defense:** You were not asked to provide everything related to this incident?
> **BPA Muniz:** Not my Government phone.
> **Defense:** You weren't asked to provide any information on your Government phone?
> **BPA Muniz:** No.

(Tr. 89). BPA Muniz, the Government's self-selected <u>testifying</u> witness at the May 4, 2026, Motions Hearing, had <u>never</u> even been asked by the Government's counsel to provide his Government phone to the prosecution. Given BPA Muniz was clearly <u>not</u> asked to participate in the discovery process, the Court can quite reasonably infer that it is highly likely the Government's counsel did not ask <u>any</u> of the other agents involved in the January 20, 2026, incident to search for and produce responsive information as part of their prosecutorial discovery obligations.

Based on the aforementioned discovery deficiencies, the Court believes there is more than a reasonable basis to find the AUSAs, the SAUSAs, and their supervisors in the present case,

completely and repeatedly failed to fulfill their prosecutorial discovery obligations. Similarly, the Court finds there is more than a reasonable basis to infer that the Government is pursuing dismissal of the present action in order to avoid the discovery obligations imposed by this Court. See, Ahmed, 837 F. Supp. 3d at 990 ("The Government's attempt to use the Federal Rules of Criminal Procedure as a means of evading Court orders is certainly troubling and lends support to an inference of prosecutorial harassment.") (citing Salinas, 693 F.2d at 353 (finding dismissal without prejudice was erroneous when the Government "used Rule 48(a) to gain a position of advantage" and "trifled with the Rules of Criminal Procedure to harass [the] defendant").

## IV. Conclusion

Accordingly, in consideration of not only the Government's repeated unprofessional failures to satisfy its prosecutorial discovery obligations in the present case, but also the Government's carelessness in initiating and continuing to prosecute a case which so clearly relied on blatant contradictions and potentially unlawful conduct by the investigating Agents, this Court, based on the foregoing and all the files, records, and proceedings herein, **HEREBY RECOMMENDS THAT** the Government's Motion to Dismiss, [Docket No. 63], be **GRANTED**, and that the dismissal be with prejudice.[20]

Dated: November 2, 2026

s/Leo I. Brisbois
Hon. Leo I. Brisbois
U.S. MAGISTRATE JUDGE

[20] Given that this Court recommends dismissing this action in its entirety with prejudice, the Court additionally recommends Defendant's Motion to Dismiss for Outrageous Government Misconduct, [Docket No. 34]; Motion to Dismiss for Failure to State an Offense or for a Bill of Particulars, [Docket No. 35]; and Motion to Suppress Stop and Arrest, [Docket No. 36], be **DENIED** as moot.

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.